IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY E. WEST, JR. | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| | ) Civil Action No. 07-1378 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION

CONTI, District Judge.

Pending before this court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claims of Jeffrey E. West, Jr. ("plaintiff") for supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-83, and disability insurance benefits ("DIB") under Title II of the SSA, 42 U.S.C. §§ 401-33. Plaintiff asserts that the decision of the administrative law judge (the "ALJ") should be reversed because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny plaintiff's motion and grant defendant's motion because the decision of the ALJ is supported by substantial evidence.

**Procedural History**

On December 3, 2003, plaintiff filed an application for DIB and on October 17, 2003, for SSI, alleging that his Crohn's disease and several mental impairments rendered him unable to work. (R. at 83-85, 304-07.) Plaintiff's claims were denied on May 14, 2004. (R. at 64-68.) Plaintiff requested and was granted a hearing before the ALJ, which was held on February 23, 2006. (R. at 40-61.) Plaintiff, who was represented by counsel, testified at the hearing. (R. at 43-54.) A vocational expert ("VE") also testified. (R. at 55-60.) On March 16, 2007, the ALJ issued an unfavorable decision (R. at 11-32) and plaintiff timely filed a request for review with the Appeals Council. (R. at 10.) After a denial of the request on August 10, 2007, and having exhausted all administrative remedies, plaintiff filed this appeal. (R. at 6-9.)

**Plaintiff's Background and Medical History**

Plaintiff is a twenty-eight-year-old man, who received a G.E.D. and completed one year of college. (R. at 44.) In the past, he worked as a cashier, fast food cook, server, and as a cleaner. (R. at 45-46, 99.) Plaintiff's medical history began when he was seventeen and was first diagnosed with Crohn's disease.[1] (R. at 147.)

---

[1] Crohn's disease is an inflammatory bowel disease associated with severe abdominal pain, diarrhea, and vomiting. Harrison's Principles of Internal Medicine 1886, 1890 (17th ed. 2008). "Controlled trials of Pentasa and Asacol in active [Crohn's disease] demonstrate a 40-60% clinical improvement or remission." Id. at 1895.

Medical History

On November 3, 1998, plaintiff was hospitalized for a flare up of his Crohn's disease. After a brief treatment, the exacerbated symptoms receded, plaintiff's abdomen returned to normal, and he was prescribed Pentasa[2] and Prednisone to control any future flaring of his Crohn's disease. (R. at 146.) Plaintiff's medical records, however, indicate that plaintiff was "somewhat noncompliant" with taking his prescribed medication and that he sometimes did not take any medication for his Crohn's disease. (R. at 153, 160, 191, 198, 248, 287.) On multiple occasions, he visited his treating physician or was hospitalized with complaints of exacerbation of his Crohn's disease. (R. at 169, 182, 185.) Eventually, he 'underwent a resection of the terminal ileum and right colon," which "[h]e tolerated well." (R. 168.) In February 2004, he underwent a colonoscopy that showed "[s]ome mild inflammatory changes" and "some scattered small aphthous ulcers," but "[o]therwise, no gross evidence of recurrent Crohn's disease." (R. at 206.) The medical records reflect that plaintiff did not follow his doctors' advice to take the Pentasa. (R. at 294-95.)

The record reflects that Dr. Chatta treated plaintiff from December 2002 until January 25, 2006. (R. at 239-51, 287-302.) From March 2004 to March 2005, plaintiff frequently visited Dr. Chatta with different complaints of pain throughout the entire body. X-rays of the alleged pain centers were taken, but they all came back normal. (R. at 298-302.) During these visits, Dr. Chatta found no evidence of abdominal pain. (R. at 240, 291, 292, 294, 296.) In October 2004, Dr. Chatta noted that plaintiff was being seen for panic attacks and anxiety and did not have

---

[2]Pentasa is an anti-inflammatory agent for gastrointestinal use; most common adverse reactions include diarrhea, headache, nausea, abdominal pain, vomiting and rash, constipation; depression, dizziness, insomnia, somnolence, leg cramps (medical relationship to the drug has not been proven for many of these symptoms). Physicians' Desk Reference 3112-13 (62nd ed. 2008).

other complaints. (R. at 296.) Dr. Chatta reported at that time that plaintiff should take medication for his Crohn's disease for "some help with this problem." (R. at 295.)

In May 2004, a disability determination services' medical consultant performed a physical residual functional capacity assessment ("PRFCA") of plaintiff. After reviewing plaintiff's medical history, the consultant concluded that plaintiff was capable of standing and walking for six hours in an eight-hour work day, could lift about twenty pounds, and had no established postural, manipulative, or visual limitations. (R. at 253-54.) The consultant based his findings on prior medical records that showed successful treatment of plaintiff's mental and physical conditions, and on plaintiff's description of his daily activities, which included helping with household tasks and taking care of his personal needs. (R. at 220, 258.)

On July 12, 2005, plaintiff visited Dr. Demby, this time with complaints of abdominal pain and increased pulse; however, when the doctor refused to prescribe Klonopin[3] based on plaintiff's drug addiction history, plaintiff left the office without taking a prescription for medication for abdominal pain. (R. at 289.) The physical evaluation did not reveal any tenderness or guarding associated with the abdominal area. (Id.)

On January 25, 2006, plaintiff went to Dr. Chatta for a check up. (R. at 287.) Plaintiff reported to Dr. Chatta that, despite his history of depression and anxiety, he had not taken medication for those conditions "for a while." (Id.) Dr. Chatta reported that plaintiff was not taking his Crohn's disease medication and that, despite complaints of pain in the abdomen and

---

[3]Klonopin is a type of benzodiazepine and is used for seizure disorders, panic disorders( intense fear, with sweating shaking, chest pain, dizziness), should not be used in patients with history of sensitivity to benzodiazepines. Side effects may be changes in the cognitive or motor performance, including drowsiness, depression, hallucinations, insomnia, suicidal attempts, nervousness, muscle weakness, pains. Physicians' Desk Reference 2732-34 (62nd ed. 2008).

sometimes having diarrhea, the exam showed no tenderness in this area. (Id.) The same day, Dr. Chatta performed a physical capacity evaluation test ("PCET") and determined that plaintiff was capable of sitting or standing for fifteen minutes per hour, and a total of four hours per eight-hour work day; that plaintiff needed to lay down for a total of four hours per eight-hour work day; and that plaintiff could never kneel or crawl. (R. at 271, 272.) Dr. Chatta identified the medical findings which supported the limitations as being plaintiff's 2003 Crohn's disease surgery and a 2004 colonoscopy showing small areas of inflammation. (R. at 273.)

History of drug abuse and drug-related arrests

Although having participated in a drug rehabilitation program since 2001 and having taken Methadone[4] four times a week to control his drug addiction and heroine abuse, plaintiff continued to test positive for opiates. (R. at 208, 297.) On March 1, 2004, after his colonoscopy, plaintiff was hospitalized for an overdose and a drug test came back positive for cocaine and benzodiazepines. (R. at 209-10.) On January 30, 2006, five days after the PCET was performed, a drug test that Dr. Chatta requested on January 25, 2006, came back positive for benzodiazepines.[5] (R. at 287, 297.) Plaintiff's history of drug abuse is coupled with multiple arrests for drug-related offenses, which resulted in incarcerations or house arrests for the majority of 2002, 2003, and 2004. (R. at 197-98, 204, 220, 242.) Based upon plaintiff's history of drug

---

[4]Methadone is a "synthetic opioid analgesic with a long duration of action, used primarily to treat pain and to detoxify or maintain patients who are addicted to narcotic pain relievers. . . . [I]s habit-forming and subject to abuse; its use should be carefully supervised." Taber's Cyclopedic Medical Dictionary 1352 (20th ed. 2005).

[5]Benzodiazepine is a "psychotropic drug[] with potent hypnotic and sedative action, used predominantly as an antianxiety and sleep-inducing drug[]. . . . Side effects . . . may include impairment of psychomotor performance, amnesia, euphoria, dependence, and rebound (i.e., the return of symptoms) transiently worse than before treatment, upon discontinuation of the drug." Taber's Cyclopedic Medical Dictionary supra note 7 at 239.

abuse, Dr. Chatta lowered plaintiff's Klonopin dosage and advised plaintiff to seek psychiatric help if he wanted to continue taking the drug. (R. at 290, 294.)

Mental health history

Plaintiff identifies his mental impairments as stemming from his Crohn's disease, which has caused him stress and depression. (R. at 54, 250.) In July 2002, while in prison for a drug-related offense, plaintiff was diagnosed with bipolar disorder, irritable mood swings, and depression. The examining doctor prescribed lithium. (R. at 198.) Following this diagnosis, Dr. Hiller, a staff psychiatrist, renewed plaintiff's bipolar disorder medication. (R. at 199.) Dr. Hiller's notes dated December 10, 2002, reveal that plaintiff, under house arrest at the time, was complaining about his relationship with his father. (R. at 197.) The doctor noted plaintiff would benefit from meeting with a therapist. (R. at 196.) In a subsequent psychiatric evaluation, performed on September 4, 2003, Dr. Nigam, a psychiatrist, indicated that plaintiff was diagnosed with generalized anxiety disorder and ruled out major depression, without making any mention of bipolar disorder. (R. at 195.) The doctor's notes show that plaintiff was "pleasant with a help-seeking attitude," and grossly intact cognitive functions. (Id.) Plaintiff was placed on Lexapro[6] and continued the Klonopin. (R. at 195.)

On March 22, 2004, a psychologist, Dr. Newman, examined plaintiff and determined that there were no indications of bipolar disorder or depression. (R. at 221-22.) During the evaluation, plaintiff reported that he helped his mother with household chores, his sister with her

---

[6]Lexapro is an antidepressant used for treatment of major depression disorder (MDD), generalized anxiety disorder (GAD); in early phases of the treatment some patients experience worsening of their depression and suicide risk, especially in young adults (up to 24 years old). Side effects for MDD may include nausea, diarrhea, insomnia, constipation, and for GAD may be headache, nausea, vomiting, even abdominal pain, insomnia, somnolence. Physicians' Desk Reference 1175-79 (62nd ed. 2008).

homework, and if he were not under house arrest, he would have gone shopping as well. (R. at 220.) Plaintiff also commented that he does "not feel depressed but everybody says [he is]." (Id.) The doctor noted that plaintiff's speech was well articulated, and the content was rational and coherent. Dr. Newman opined that plaintiff could successfully manage his finances, could understand and perform repetitive tasks, and was capable of interacting with the general public. (R. at 221-22.) At the time, plaintiff was taking Xanax[7] and Effexor.[8]

The last psychiatric evaluation that plaintiff received was at the request of his attorney prior to the hearing before the ALJ. On February 3, 2006, Dr. Eisler examined plaintiff. He noted plaintiff told him that plaintiff had been drug "'clean' for 3.5 years." (R. at 284.) Plaintiff also reported that when plaintiff was incarcerated he was on lithium which "really helped," but he stopped taking the medication when he was released. (Id) Dr. Eisler determined that with continued episodes of severe abdominal pain, diarrhea of eight to twelve times a day, hearing voices, inability to relate predictably in social situations, having suicidal thoughts and bipolar disorder, plaintiff appeared to be "quite unemployable." (R. at 283-84.) Dr. Eisler found plaintiff had a GAF score of 20.[9] (R. at 284.)

---

[7]Xanax, of the benzodiazepine family, is a short-acting drug used to treat moderate to severe panic attacks and anxiety disorders; side effects include drowsiness, depression, hallucinations, constipation, diarrhea, restlessness. www.drugs.com/xanax.

[8]Effexor is an antidepressant and is prescribed for the treatment of anxiety disorders and major depression; possible side effects include risk of suicide; general side effects include nausea, constipation, insomnia, fatigue. Physicians' Desk Reference 3358-60 (62nd ed. 2008).

[9]The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 50-60 denotes moderate impairment. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or

**Standard of Review**

An administrative law judge's findings, subsequently adopted by the Commissioner, that deny benefits to a claimant are subject to judicial review. 42 U.S.C.A. § 405(g). This court must determine whether the administrative law judge's findings of fact are supported by substantial evidence. Id. Substantial evidence may be defined as somewhat less than a preponderance of evidence, but more than a scintilla of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). If a "'reasonable mind might accept [such evidence] as adequate,'" it is substantial. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Under this standard, this court cannot substitute its own conclusions for those of the administrative law judge. Burns v. Burnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)).

**Discussion**

To establish disability under the SSA, a plaintiff must demonstrate his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The nature and extent of these mental or physical impairments must be so severe that they preclude the plaintiff not only from returning to his or her previous employment but also from acquiring substantial gainful work that exists in the national economy, considering his age, education, and prior work experience. 42 U.S.C. § 423(d)(2)(A).

---

judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .; of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." Id.

The administrative law judge follows a five-step sequential evaluation for determining disability. The five-step process evaluates the following elements: (1) whether the plaintiff is currently engaged in substantial gainful activity; (2) if not, whether the plaintiff has a severe impairment; (3) if so, whether the impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1; (4) if not, whether the plaintiff's impairment prevents him from performing his past work; (5) and if not, whether the plaintiff can perform any other work in the national economy, given the plaintiff's age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920. The burden of proof with respect to steps one through four lies with the plaintiff, while the defendant bears the burden of proof with respect to step five. Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

In the instant case, the ALJ determined that: (1) plaintiff has not engaged in substantial gainful activity since the alleged disability onset date; (2) he suffers from the following severe impairments: Crohn's disease, asthma, anxiety, and depression; (3) these impairments do not satisfy or medically equal one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff is unable to perform any past relevant work; and (5) plaintiff has the residual functional capacity to perform work at light exertional level and could perform other jobs existing in significant numbers in the national economy. (R. at 15-28.)

Plaintiff raises three arguments in opposition of the ALJ's findings with respect to step five of the sequential evaluation. First, plaintiff argues that the ALJ improperly weighed the medical opinions of Dr. Chatta and Dr. Eisler. Second, plaintiff asserts that the ALJ improperly determined the plaintiff's residual functional capacity ("RFC"), which is directly tied to the first argument. Plaintiff's third argument that the ALJ relied upon an incomplete hypothetical

question to the VE is likewise intertwined with first issue – whether the ALJ gave inadequate weight to the medical opinions of Dr. Chatta and Dr. Eisler and thereby failed to include the proper limitations in the hypothetical question relied upon by the ALJ. Each of plaintiff's arguments will be addressed.

I.     Weight afforded to Dr. Chatta and Dr. Eisler's medical opinions

The crux of the issues raised relate to the weight given by the ALJ to the opinions of Dr. Chatta and Dr. Eisler. Although it is well established that a treating physician's opinion carries more weight than that of an examining physician, an administrative law judge may reject the treating physician's opinion by clearly stating the reasons for the rejection. See Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986). Controlling weight is appropriate for a treating physician's medical opinion when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, . . . ." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202 (3d Cir. 2008).

a.     Dr. Chatta

In the instant case, the ALJ explained that the opinion of Dr. Chatta, plaintiff's treating physician, was disregarded based upon the totality of the evidence presented in the record. (R. at 22.) The results of the PCET reported by Dr. Chatta were not supported by Dr. Chatta's observations and records concerning plaintiff's health. (R. at 145-303.)

Dr. Chatta used plaintiff's Crohn's disease surgery and subsequent colonoscopy as the main explanations for her findings. (R. at 273.) The ALJ pointed to evidence surrounding these

health issues. (R. at 22-25.) The ALJ referred to plaintiff's undergoing a laparotomy for his Crohn's disease in May 2003, which was successful, and a colonoscopy on February 19, 2004, that showed only small areas of inflammation and no gross recurrence of Crohn's disease. The ALJ noted that these surgeries resulted in improvements of plaintiff's symptoms as demonstrated by the record. (R. at 24.) Following the surgeries, plaintiff was prescribed medications to control his symptoms, which he did not take as prescribed. In October 2004, Dr. Chatta noted, that plaintiff was being seen for panic attacks and anxiety and did not have other complaints. Dr. Chatta reported at that time that plaintiff should take medication for his Crohn's disease for "some help with this problem." (R. at 295.) In January 2006, plaintiff reported to Dr. Chatta that, despite his history of depression and anxiety, he had not taken medication for those conditions "for a while." (R. at 287.) Plaintiff's failure to take prescribed medication which Dr. Chatta noted could help his condition and evidence of plaintiff's use of cocaine and benzodiazepines and drug-seeking behavior support the ALJ's conclusion to reject Dr. Chatta's PCET findings. There is substantial evidence of record to support the weight given by the ALJ to the opinion of Dr. Chatta.

b.  <u>Dr. Eisler</u>

The ALJ did not err in rejecting Dr. Eisler's February 2006 psychological evaluation of plaintiff's mental health. All the findings of Dr. Eisler were based upon plaintiff's complaints and statements made during one evaluation, without taking into account his medical history. In determining plaintiff's mental health, Dr. Eisler relied upon his patient's statement that he has been off drugs for more than three years, when plaintiff's medical records show the presence of benzodiazepines and cocaine on drug screens, including the January 2006 use of benzodiazepines

by plaintiff and the March 2004 test showing use of cocaine. Given the lack of longitudinal relationship between Dr. Eisler and plaintiff and the other inconsistent medical evidence in the record, including plaintiff incorrectly reporting he had been drug free for three and one-half years when he tested positive for benzodiazepines and for cocaine within two years of the evaluation, the court concludes that the ALJ's determination to give little weight to Dr. Eisler's psychiatric evaluation is supported by substantial evidence in the record.

II.     The ALJ properly determined plaintiff's residual functional capacity

"'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations. See Cooper v. Barnhart, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a person's RFC, an administrative law judge must consider all evidence of record. 20 C.F.R. §§ 404.1520, 416.920. Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. Id. As the court stated in Burnett, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" Id. at 121 (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

The ALJ discounted plaintiff's testimony of having constant pain in light of the contradictory medical evidence from Dr. Chatta, which documented plaintiff's progress after the Crohn's disease surgery and his failure to take prescribed medications to control his conditions.

The ALJ gave less weight to Dr. Chatta's opinion, as part of the PECT, that plaintiff was unable to work. The ALJ reasoned that the opinion was inconsistent with Dr. Chatta's own observations on record that plaintiff has been recuperating well, has not had any abdominal pain complaints for a while, and was not taking his Crohn's disease medications. See Plummer, 186 F.3d at 429 (recognizing that a physician's opinion may be rejected if there is contradictory medical evidence). Plaintiff's failure to comply with prescribed medical treatment may be inconsistent with complaints of disabling pain. 20 C.F.R. §§ 404.1530(b), 416.930(b).

As noted by the ALJ, the record raises questions about plaintiff's possible exaggeration of pain symptoms related to his Crohn's disease. The regulations provide that when evaluating the intensity and persistence of subjective complaints, the ALJ must consider all medical evidence, treatment, medication, daily activities, and any additional evidence that would show how plaintiff's symptoms may affect the performance of basic activities at work. 20 C.F.R. §§ 404.1529, 416.929. Plaintiff's complaints to Dr. Demby about abdominal pain and anxiety raise credibility questions. The doctor's records indicate that during the examination, although plaintiff complained about abdominal pain, there was no tenderness, guarding or rebound in the abdominal area. After the doctor refused to prescribe Klonopin to plaintiff, plaintiff left the office without the prescription for the medication for his abdominal condition. In light of the evidence of record considered as a whole, the ALJ did not err in concluding that plaintiff's complaints of pain were not completely credible. "[T]he objective medical evidence suggested exaggeration of pain symptoms and narcotic-seeking behavior." Lane v. Comm'r of Soc. Sec., 100 Fed. App'x 90, 96 (3d Cir. 2004) (plaintiff's degree of pain and limitations caused by hysterectomy were inconsistent with medical evidence showing exaggeration of pain and narcotic-seeking behavior).

The ALJ stated that while "[plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . [plaintiff's] statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (R. at 24.) As mentioned previously, the evidence showed that plaintiff's symptoms can be controlled with medication, he had a successful surgery that addressed symptoms of Crohn's disease, and his daily activities are inconsistent with the alleged physical disability. Considering the record as a whole, the court concludes that substantial evidence supports the ALJ's determination that plaintiff was able to engage in light exertional level work, which involves lifting twenty pounds occasionally and ten pounds frequently, consists of simple, repetitive tasks, and requires minimal contact with the public. (R. at 24, 25.) The court also concludes that the ALJ did not err in accommodating plaintiff's impairments by limiting his work environment to one devoid of dust, fumes and odors and requiring reasonable access to bathroom facilities.

III.     Hypothetical question

As discussed above, the ALJ's decisions to give less weight to the PECT results reported by Dr. Chatta and the psychiatric evaluation performed by Dr. Eisler are supported by substantial evidence of record. When questioning the VE at the administrative hearing, the ALJ posed a hypothetical question to determine whether jobs existed in the national economy that plaintiff could perform given his limitations. (R. at 56-58.) The ALJ set the limitations to encompass a person of the same age, education, and past work experience as plaintiff, who was limited to light work with simple, repetitive tasks that would involve minimal contact with the public, with environmental and temperature limitations. (R. at 56.) The ALJ included a limitation of needing reasonable access to bathroom facilities. ( R. at 57.) Given the limitations, the VE opined that

there was a sufficient number of jobs in the national economy to accommodate a person with such medical limitations. (R. at 57.)

Having considered plaintiff's arguments, including the weight given to the medical opinions, and having found the ALJ did not err in his conclusions regarding plaintiff's limitations, the hypothetical relied upon was not deficient. See Johnson, 529 F.3d at 529 (when a hypothetical accurately portrays a claimant's impairments, the hypothetical is not deficient; not every alleged impairment is required be included in a hypothetical). (R. at 56-57.)

## Conclusion

The ALJ's decision to deny plaintiff DIB and SSI is supported by substantial evidence of record. Therefore, defendant's motion for summary judgment (Docket No. 9) shall be granted and plaintiff's motion for summary judgment (Docket No. 7) shall be denied.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: February 19, 2009